O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **VASILI GATSINARIS, D.C., ET AL.**<br><br>      **Plaintiffs,**<br><br>    vs.<br><br>**ART CORPORATE SOLUTIONS, INC., ET AL.,**<br><br>      **Defendants.** | **Case No.: SACV 15-0741-DOC (DFMx)**<br><br>**ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION [15]** |

Before the Court is Plaintiffs' Motion for Preliminary Injunction ("Motion") (Dkt. 15). The Court held an evidentiary hearing on the Motion on Friday, May 29, 2015. Having reviewed the papers and supporting evidence and heard testimony, the Court DENIES the Motion.[1]

---

[1] Given the posture of this Order, the Court elects to issue it prior to determining the pending jurisdictional issues, recognizing that if the Court lacks jurisdiction, this Order denying relief will be without force or effect. *Orban v. O'Connor*, 210 F.3d 384 (9th Cir. 2000).

**I.      Background**

   **A. Facts**

      **1.      Active Release Techniques**

Where not otherwise indicated, the following background was provided in Defendants' Opposition and confirmed by Defendants' witness, Brent Kruel.[2] Active Release Techniques ("ART") was developed and created by Defendant Dr. P. Michael Leahy ("Dr. Leahy") and is a patented soft tissue system/movement based massage technique that treats problems with muscles, tendons, ligaments, fascia and nerves. According to Defendants, the ART system employs several hundred unique treatment protocols, protected by six patents.

<u>ART LLC</u>

In order for a chiropractor to practice ART, he must receive a certification through Active Release Techniques LLC ("ART LLC"). ART LLC is a company formed to teach and certify health care providers how to use the ART technique and method. Upon taking and completing an ART LLC course, a provider is allowed to use the ART companies' name and trademarks for a one-year period. *See, e.g.*, Decl. of Joseph C. Daniels ("Daniels Decl.") (Dkt. 19-1) Ex. A ("License Agreement"). This allows providers to advertise that he or she has taken a course and been trained to use ART.

Materials used in the certification programs are protected by copyright. Enclosed with the materials sent to health care providers is a licensing agreement. The license agreements provide that ART LLC grants the user "a non-exclusive, non-transferable license to use the 'ART Product' to perform the Active Release Techniques on patients subject to [certain] terms and conditions." *Id.*

---

[2] Plaintiffs assert a number of foundational and authenticity objections, among others, as to the evidence provided in the Opposition. The Court overrules those objections given Mr. Kruel's testimony. The Court notes that, while Plaintiffs claim Defendants have not "established by any admissible evidence that relief is not warranted," the burden is in fact on Plaintiffs to demonstrate that relief *is* warranted. *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011).

The health care provider is also given a document that gives the provider a limited right to use the ART companies' name, trademarks, and logos, and the phrase "Certified ART Provider." According to the Trademark Agreement, "Only providers that have taken an approved ART® course, become certified, and maintain their certification may use the names ART® and Active Release Techniques®." Daniels Decl. Ex. B ("Trademark Agreement").

ART LLC is privately owned, and is not a state controlled or sanctioned certifying body; "Certified ART Provider" does not indicate compliance with official standards, instead it indicates that the particular health care provider has taken an ART LLC course, has met certain requirements established by ART LLC, and is licensed to use ART and advertise as such. According to ART LLC, failure to recertify, or breach of the Trademark Agreement, will result in the license lapsing and the provider can no longer permissibly use the ART intellectual property.

Due to its effectiveness, ART has become a popular treatment modality. *See* Pl. Mot. ART LLC has trained and certified over 15,000 providers in this technique. *Id.*

<u>ART Corporate Solutions</u>

ART Corporate Solutions LLC ("ARTCS") is an affiliate of ART LLC that provides on-site ART treatments to businesses and corporations. ARTCS's basic business model is that it enters into a contract with a business or entity to provide ART services on-site (the "Corporate Contract"). The Corporate Contract provides that ARTCS will provide a certified ART Provider to regularly come on-site to provide ART treatments to the client's employees. After securing a Corporate Contract, ARTCS then matches that Corporate Contract with an ART Provider who is a member of ARTCS's Elite Provider Network ("EPN"), and the selected EPN member may then provide the on-site services pursuant to the Corporate Contract. ARTCS screens its EPN members through an application process, and each must sign a Provider Agreement. EPN members are independent contractors, who provide services on behalf of ARTCS when treating ARTCS clients.

Setting ARTCS apart from its competitors in the on-site corporate wellness service business, is that the Occupational Safety and Health Administration ("OSHA") has determined

that ART "is considered first aid for injury and illness recordkeeping purposes" rather than a medical treatment. Daniels Decl. Ex. C ("OSHA Letter"). The distinction reduces record keeping requirements, as employers do not have to record services as a work-related injury or illness. OSHA auditors have also recognized ARTCS's program as a "Best Management Practice."

### 2. Plaintiffs' Business

Plaintiff Vasili Gatsinaris received his chiropractic license in 2002, after which point he enrolled in training with ART LLC to become certified in providing ART. He received his ART certification in 2002, and has been continuously recertified in ART from 2002 until September 2014, and has provided ART services to his clients continuously throughout that time period. Declaration of Vasili Gatsinaris, D.C. ("Gatsinaris Decl.") (Dkt. 15-2) ¶¶ 5 & 6.

Each year, Dr. Gatsinaris was required to complete a training course and pay a fee in order to complete the ART recertification process. He was not aware of any other prerequisites or conditions to renew his ART certification. Gatsinaris Decl.¶ 7. Dr. Gatsinaris has promoted himself as an ART practitioner and has built his practice around providing ART to his clients, and many see him expressly for that service. Gatsinaris Decl. ¶ 8.

In 2008, ARTCS invited Dr. Gatsinaris to participate in ARTCS's corporate wellness program as an "Elite Providers" in the EPN. Gatsinaris Decl. ¶ 9. Dr. Gatsinaris qualified as an Elite Provider and signed an "EPN Provider Application" in 2008. He has been a member of the EPN since that time. As part of the EPN, Dr. Gatsinaris provided ART services to various corporate clients as assigned by ARTCS, and received payment for his services through ARTCS. Gatsinaris Decl. ¶ 10.

In order to participate as an EPN member, Dr. Gatsinaris signed a Provider Agreement. Gatsinaris Decl. ¶ 11. The agreement states:

> d. Competition. PROVIDER may contract with any PAYOR or EMPLOYER independently of the NETWORK. However, in the event the PROVIDER has both a direct and NETWORK Contract, the NETWORK contract shall prevail. PROVIDER shall not share practice specific pricing

information or provider contract compensation with other Participating PROVIDERS.

Non-competition. As ART Corporate Solutions, Inc. will provide education, training, support and access to proprietary systems the PROVIDER agrees to pursue new corporate first aid/wellness business only through, or in conjunction with, ART Corporate Solutions, Inc. In the event PROVIDER terminates or is terminated from the NETWORK, PROVIDER shall not solicit or directly contract with existing NETWORK PAYORS or EMPLOYERS for a period for two (2) years from the expiration of the Agreement for the purposes of providing ART treatment services. PROVIDER agrees that NETWORK shall be able to enforce this provision via an injunction or other necessary means to protect NETWORK relationships and PROVIDER shall bear the cost of such enforcement.

Gatsinaris Decl. ¶ 11.

After signing the agreement, Dr. Gatsinaris's corporation, GCI, entered into business arrangements with several companies, including Parker Hannifin, to provide ART treatment to the employees of those clients. Dr. Gatsinaris maintains that these corporate accounts were developed entirely by him, without the use of any of ARTCS's confidential and/or proprietary information, and have and had no connection to ARTCS. Gatsinaris Decl. ¶ 25.

Dr. Gatsinaris asserts that he was never informed that if he developed this independent business it would impact his ability to recertify or be a member of EPN. Based on past practice, he believed that he would continue to receive ART recertification indefinitely and developed his client base around his use of ART therapy. Gatsinaris Decl. ¶ 12.

On August 14, 2014, ARTCS sent Dr. Gatsinaris a "cease and desist" letter, described below. Gatsinaris Decl. ¶ 14.

Despite this, on August 25, 2014, Dr. Gatsinaris registered for an online ART recertification course scheduled for November 2014. His certification was set to expire in September 2014. Dr. Gatsinaris had on several other occasions not had a problem with a brief

lapse in certification if he signed up to participate in another certification course, for example, he would continue to provide services in the EPN and would not receive a cease and desist letter. *Id.* ¶16. Dr. Gatsinaris refers to this as a "bridge" certification. *Id.* ¶ 20.

Dr. Gatsinaris contacted ART LLC in November 2014 regarding the upcoming online certification program. He was informed that ARTCS had refunded his registration fees and refused his registration for the course due to issues concerning the cease and desist letter. Gatsinaris Decl. ¶¶ 18, 19.

ARTCS continued to use Dr. Gatsinaris's services as an Elite Provider for ARTCS at the location of one of their corporate clients, Cintas, through December 31, 2014, although he had not been allowed to register and take the recertification course. Gatsinaris Decl. ¶ 21. The Cintas program ended at the end of 2014, and Dr. Gatsinaris has not provided services through the EPN since that date.

Around March 16, 2015, Parker Hannifin, Dr. Gatsinaris's largest corporate client, informed Dr. Gatsinaris that it had "become aware" that his certification to provide ART had expired. It notified him that it would not allow Dr. Gatsinaris to continue providing treatment to its employees unless it provided proof of his ART certification by April 30, 2015. Gatsinaris Decl. ¶ 25. After Defendants refused to allow Dr. Gatsinaris to complete the recertification process, Plaintiffs filed a civil complaint and Ex Parte Application for a Temporary Restraining Order on April 28, 2015, in Orange County Superior Court.

Plaintiffs allege that if Defendants deny Dr. Gatsinaris the ART certification, Parker Hannifin will remove Plaintiffs as approved providers and Dr. Gatsinaris will not be able to provide further ART services through GCI and American Corporate Health LLC ("ACH") to Parker Hannifin and GCI and ACH will lose around $250,000 in combined monthly revenue, in addition to other lost business opportunities, and "will be forced to terminate their employment and contractual relationships with 42 employees/contractors." Gatsinaris Decl. ¶ 33.

### B.  Colorado Action - ART Suit against Dr. Gatsinaris

In 2013, the ART companies began receiving questions from other health care providers trained in ART about email solicitations they were receiving from Dr. Gatsinaris's company

ACH. Daniels Decl. Ex. E. ARTCS began an investigation into ACH's conduct, and discovered that ACH provides on-site corporate ART treatment.[3] ACH also apparently copied material from ARTCS's website and engaged ARTCS's former clients. ARTCS sent Dr. Gatsinaris a cease and desist letter on August 14, 2014 in relation to this conduct, and decided not to recertify him.

Finding that Dr. Gatsinaris did not comply with the terms of the cease and desist letter, on November 14, 2014, ARTCS filed a lawsuit in Colorado against each of the Plaintiffs in this action, for breach of contract and other claims. *See* District Court, El Paso County, Colorado Case No. 14-cv-34232.

Dr. Gatsinaris, GCI and ACH challenged personal jurisdiction in Colorado. Gatsinaris Decl. ¶¶ 27, 28. The District Court in Colorado denied Plaintiffs' – defendants in Colorado – motion to dismiss for lack of personal jurisdiction on May 19, 2015. Daniels Decl. Ex. I.

### C. Procedural History

On April 28, 2015, the day by which Parker Hannifin threatened it would cease using Plaintiffs' services, Plaintiffs filed a Complaint in Orange County Superior Court. Compl (Dkt. 1-2). In the Complaint, Plaintiffs assert six claims for: (1) declaratory relief; (2) unfair competition in violation of California Business and Professions Code §17200 ("UCL"); (3) intentional interference with a contract; (4) intentional interference with prospective economic advantage; (5) negligent interference with a prospective economic advantage; (6) and violation of Cartwright Act, California Business and Professions Code § 16720.

Plaintiffs immediately sought a temporary restraining order, to enjoin Defendants from (1) "denying the automatic extension of Dr. Gatsinaris' ART certification" and (2) prohibiting Defendants from "interfering with the renewal process for Dr. Gatsinaris' ART certification." On May 1, 2015, the state court granted the requested relief, in part, prohibiting Defendants from "denying the automatic extension of Dr. Gatsinaris' ART certification to bridge any existing gap in certification until and subject to the determination of Plaintiffs' Application for

---

[3] Specifically, ACH provides billing and management services for other providers.

-7-

Preliminary Injunction." *See* TRO and OSC Re: Preliminary Injunction (Dkt. 14-3). The state court set a hearing for the preliminary injunction on May 15, and instructed Defendants to reply by May 11, 2015.

Defendants removed this action on May 11, 2015, prior to filing their opposition to the TRO. *See* Notice of Removal (Dkt. 1).

On May 20, 2015, Plaintiffs filed concurrently an application for an extension of the TRO pursuant to Federal Rule of Civil Procedure 65(b), along with the present Motion. The Court granted the extension, ordering that the TRO issued on May 1, 2015 remain in full force and effect until the hearing on Plaintiffs' Motion for Preliminary Injunction (Dkt. 18). It set a date for hearing of May 29, 2015. *Id.*

On May 26, 2015, Defendants filed their opposition to the Motion for Preliminary Injunction along with two motions to dismiss. The first motion (Dkt. 20) challenges this Court's personal jurisdiction over individual defendant Dr. Michael Leahy. The second motion seeks dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Dkt. 21).

Plaintiffs filed a reply on May 27, 2015 (Dkt. 22).

**II.  Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). In order to succeed on their Motion, the Plaintiffs must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) the requested injunction is in the public interest. *Id.* at 20. In deciding whether to exercise their sound discretion to award an injunction, the Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24.

**III.  Analysis**

The Court will address each prong of the preliminary injunction test in turn.

### A. Serious Questions

The Court must first assess whether the Plaintiff have raised "serious questions" regarding their likelihood of success on the merits.

In the Ninth Circuit, "a preliminary injunction is appropriate when a plaintiff demonstrates ... that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided the other factors in *Winter* are still satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "Serious questions" are those that are "substantial, difficult and doubtful, and requiring a more thorough investigation." *Northwest Envtl. Def. Ctr. v. United States Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1302 (D. Or. 2011).

In the complaint, Plaintiffs assert six claims for relief, but in their briefing focus only on the UCL – under the unfair or unlawful prong – and California Business and Professions Code § 16600. California Business and Professions Code § 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600.

California's UCL, Business & Professions Code § 17200, provides relief for "unfair competition," which is defined as "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *McVicar v. Goodman Global, Inc.*, 1 F. Supp. 3d 1044, 1049-50 (C.D. Cal. 2014).

> California courts use three different tests to assess whether a business practice is "unfair" such that it violates the UCL. 1 F. Supp. 3d 1044, 1053–54 (C.D. Cal. 2014). Under the balancing test, an unfair business practice is "one in which the gravity of the harm to the victim outweighs the utility of the defendant's conduct." *Id.* (internal quotation marks omitted). The public policy test "requires that the UCL claim be tethered to some specific constitutional, statutory, or regulatory provisions." *Id.* (internal quotation marks omitted). The section 5 test, based on section 5 of the Federal Trade Commission Act, finds a business practice unfair if "(1) the consumer

>injury is substantial, (2) any countervailing benefits to consumers or competition do not outweigh the injury, and (3) the consumers could not reasonably avoid the injury." *Id.* The Ninth Circuit has cast doubt that the section 5 test is appropriate in consumer cases, since the section 5 test was developed for antitrust cases. *Lozano v. AT & T Wireless Servs., Inc.,* 504 F.3d 718, 736 (9th Cir. 2007).

*Peterson v. Mazda Motor of Am., Inc.*, 44 F. Supp. 3d 965, 972 (C.D. Cal. 2014).

The "unlawful" prong of the UCL " 'borrows' violations of other laws and treats them as unlawful practices." *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). It proscribes "anything that can properly be called a business practice and that at the same time is forbidden by law." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717–18, 113 (2001) (quoting *Barquis v. Merchants Collection Assn.*, 7 Cal. 3d 94, 113 (1972) (internal quotation marks omitted)).

As an initial matter, Plaintiffs fail to address or acknowledge Defendants' intellectual property rights that are clearly implicated in this lawsuit. The intellectual property interests are intertwined with the relief requested, and Plaintiffs would have to establish some legal right to Defendants' property in order to prevail. They have failed to do so, and, in fact, Dr. Gatsinaris in the evidentiary hearing essentially admitted that he has no right to that property. In the reply, Plaintiffs present conclusory arguments regarding antitrust laws, monopolies, and exploitation, but wholly fail analogize the facts of those cases to this, or explain the intersection with the UCL or § 16600. This is insufficient.

More crucially, Plaintiffs do not go into any detail about how Plaintiffs could prevail – for example, by citing applicable cases, or analyzing anything but the most general recitation of the statutory text. Under none of their theories have Plaintiffs explained what law compels or allows this court to issue an order mandating that Defendants continue to allow Dr. Gatsinaris to receive certification and call himself a certified ART provider in light of Defendants' intellectual property rights.

Even were a jury to find some aspect of Defendants conduct unfair or unlawful, Plaintiffs have not made any showing that this finding would support the remedy Plaintiffs seek in this Motion, namely, compelling Defendants to allow Dr. Gatsinaris to remain certified through Defendants' business. Similarly, were part of the agreement void under California Business and Professions Code § 16600, it is not evident how the remedy would be forcing Defendants to continue to provide an ART provider certification. Not only have Plaintiffs failed to provide any legal precedent supporting this type of relief, it contradicts basic fundamentals of contract law and free enterprise. *See Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 408 (2003) (acknowledging the "long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal" (internal quotation omitted)).

Plaintiffs use general language and little authority to support their position. Plaintiffs fail to lay out even the basic elements of each claim which allegedly supports their requested relief. Therefore the Court finds that the evidence Plaintiffs presented is unlikely to support the relief Plaintiffs request. No serious questions have been raised.

### B. Irreparable Injury

Although the failure to raise serious questions is fatal to the Motion, the Court will consider the other substantive prongs of the preliminary injunction standard.

The second factor a court must analyze in determining whether to issue a preliminary injunction is the likelihood of irreparable harm in the absence of injunctive relief. "The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies." *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (citing *Sampson v. Murray,* 415 U.S. 61, 88 (1974)). "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered [] ." *InstantCert.com, LLC v. Advanced Online Learning, LLC*, No. 2:11-CV-1833-MMD-GWF, 2012 WL 3689498, at *4 (D. Nev. Aug. 27, 2012) (*citing* C. Wright, A. Miller & M. Kane, Fed. Practice and Procedure § 2948.1, p. 139 (2d ed.1995)).

The potential for monetary loss or other legal damages is insufficient to justify temporary injunctive relief. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Irreparable injuries are those of "permanent or at least of long duration." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (discussing environmental harm). "Evidence of threatened loss of prospective customers or goodwill [ ] supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). However, the loss of customers or goodwill must be "real and imminent, and not just speculative or potential." *Giftango, LLC v. Rosenberg*, 925 F. Supp. 2d 1128, 1140 (D. Or. 2013).

Plaintiffs assert that they will suffer "imminent and irreparable harm as a result of Defendants' interference with Dr. Gatsinaris' ART recertification process." Specifically, Plaintiffs claim they will lose $250,000 per month (99% of GCI's and 64% of ACH's total business revenue) and be forced to fire 2 employees and 40 contractors if they are not allowed to maintain their certification in the short term.[4] The 40 contractors are ART certified providers who provide ART services to ACH customers.

Defendants challenge Plaintiffs' math. Opp'n at 15. Specifically, they note that between 2008 and 2014 Dr. Gatsinaris earned approximately $143,000 total for providing services for ARTCS – so are confused as to how Plaintiffs could lose $250,000 per month as a result of Dr. Gatsinaris losing his certification. Neither Plaintiffs nor Defendants provide support for the source of their numbers.

The Court keeps in mind that "courts should be wary of granting a preliminary injunction based solely on allegations and conclusory affidavits submitted by plaintiff." *Am. Civil Liberties Union of Nevada v. City of Las Vegas*, 13 F. Supp. 2d 1064, 1071 (D. Nev. 1998) (citations omitted). The Court has serious doubts as to the source of such funds, given the description of Dr. Gatsinaris's business. Furthermore, Plaintiffs have not causally connected Dr. Gatsinaris's decertification with his need to lay off 42 employees or contractors. It is

---

[4] In the Motion, Plaintiffs characterized these persons as "employees/contractors," but have now clarified that there are 40 independent contractors and 2 GCI employees.

unclear why, if he is not certified, other providers would not be allowed to practice ART techniques. Plaintiffs have not met their burden as to this factor.

### C.  Balance of Equities

The third factor courts consider is the balance of equities.

To qualify for injunctive relief, the plaintiffs must establish that "the balance of equities tips in [their] favor." *Winter,* 129 S.Ct. at 374. In assessing whether the plaintiffs have met this burden, the district court has a "duty ... to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (*citing L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

Plaintiffs argue that Defendants will suffer no harm by allowing Dr. Gatsinaris to remain certified, while they will lose their entire business and hundreds of thousands of dollars a month. Putting aside the severe doubts the Court has about the causal link between certification and Plaintiffs' property, and the actual value of that property, Plaintiffs have severely undervalued Defendants' interests in this equation. Defendants would indeed suffer harm, as this injunction would essentially prohibit them from enforcing their intellectual property rights against Dr. Gatsinaris during the pendency of this action. Plaintiffs respond that compelling Defendants to license their product is justified because "Defendants do not have an unlimited right to enforce these rights and may not do so in a manner that is used to create a monopoly in another market — in this case, the onsite corporate wellness market."

Plaintiffs have not shown that Defendants created an improper "monopoly" in the onsite corporate wellness market. Instead, the evidence supports that Defendants have a valid intellectual property interest in ART techniques, a fact which Plaintiffs have not meaningfully challenged. Indeed, "[t]he patent law confers on the patentee a limited monopoly, the right or power to exclude all others from manufacturing, using or selling his invention." *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456 (1940). Plaintiffs have not made a factual or legal showing that Defendants are exercising an impermissible monopoly. At core, patents provide the holder with the exclusive right to use her or his technology. Defendants conduct in no way

prevents Plaintiffs from practicing other forms of on-site corporate wellness or prevents Dr. Gatsinaris from acting as a chiropractor.

Considering the weak showing Plaintiffs have made with regards to their likelihood of success and the magnitude of harm, and the substantial and meaningful right Defendants have in their intellectual property, the Court finds that the balance of equities weighs in Defendants' favor.

### D. Public Interest

Finally, the Court must consider whether Plaintiffs' request serves the public interest. "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009)(quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003)). The scope of this injunction would be limited, so this factor is a wash.

### IV. Conclusion

Considering the relevant factors, the Court finds that Plaintiffs have failed to meet their burden in demonstrating their entitlement to a preliminary injunction. The Motion is therefore DENIED. Defendants' request for sanctions is also DENIED.

DATED: May 29, 2015

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE